UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

J. HORNE, D. KING, and D. WINDMON,
minors by and through their natural parents,
ROBBY PATTERSON, PHYLLIS IRVIN,
and RUBY CAUGHN,

        Plaintiffs,

                                      File No.  5:05-CV-27

v.

                                      HON. ROBERT HOLMES BELL

J.C. PENNEY CORPORATION, INC.,
SEQUOIA INVESTMENTS V, LLC and
CORPORATE SECURITY SOLUTIONS,
INC., and MIKE STEWART, individually
and severally,

        Defendants.

_____/

## **O P I N I O N**

       Plaintiffs, three African-American teenagers, through their parents, allege violations

of their federal civil rights under 42 U.S.C. § 1981 and various state tort laws against

Defendants J.C. Penney Corporation, Inc., Sequoia Investments V ("Sequioa"), Corporate

Security Solutions, Inc., and Mike Stewart.[1]  The claims stem from an incident at the J.C.

Penney's department store at Orchards Mall in Benton Harbor, Michigan in which Plaintiffs

---

[1]On September 7, 2005, the Court dismissed Defendant Mike Stewart from the case
after Plaintiffs failed to file a Return of Service indicating that Stewart had been served with
a copy of the Summons and Complaint by July 25, 2005.  *Horne v. J.C. Penney Corp., Inc.*,
5:05-CV-27, Order Dismissing Mike Stewart (Docket #57); *see also* Notice (Docket #54).

were detained under suspicion of shoplifting.  The remaining defendants each move for summary judgment on Plaintiffs' claims pursuant to FED. R. CIV. P. 56(b).  Because Plaintiffs have failed to allege a genuine issue of material fact on their § 1981 claim, the Court grants summary judgment in Defendants' favor.  As a result of the dismissal of the federal claim, the Court declines to exercise supplemental jurisdiction over the remaining state law claims and dismisses Plaintiffs' complaint in its entirety.

I.

The following facts are undisputed, or where disputed, are taken in the light most favorable to Plaintiffs.  In the early afternoon of February 12, 2004, Plaintiffs Dwana King and Jamicia Horne arrived at the Orchards Mall in Benton Harbor, Michigan.  The two friends planned to shop for matching outfits for school.  The girls also planned to meet and shop with two other friends, Dantinequa Windmon and Danishia Counce.  King and Horne initially shopped alone because Windmon and Counce had not yet arrived at the mall.  After shopping for a few hours, King received a cellular phone call from Windmon notifying her that the other girls had arrived at the mall.  The four girls then made arrangements to meet.

King, Horne, Windmon, and Counce met in the mall in the early evening and returned to J.C. Penney.[2]  The girls shopped in the juniors section for approximately thirty minutes,

---

[2]There is some dispute between the girls' testimony regarding the duration of the events underlying this case as well as whether the group returned immediately to J.C. Penney. Horne and Windmon testified that the girls were shopping in J.C. Penney around 7:00 p.m. Horne Dep. at 10, 75; Windmon Dep. at 8, 50.  King's recollection, however, is that the four girls returned to J.C. Penney "after 4:00 o'clock."  King Dep. at 15.  Further, King and

2

but did not select any merchandise to purchase or try on in the dressing rooms.  According to the girls, while they were shopping they were constantly watched by at least one and as many as four J.C. Penney's employees.  Windmon Dep. at 11, 13, 66; King Dep. at 17, 79-80; Horne Dep. at 12-13, 107, Counce Dep. at 42.  The girls also testified that, although there were other shoppers in the store, the J.C. Penney employees appeared focused on their group.

At least two J.C. Penney employees, Mike Stewart and an unidentified male manager, followed the girls closely as they shopped.  The two men consistently maintained a short distance from the girls, usually observing them from an adjacent clothing rack.  Windmon Dep. at 11, 55; King Dep. at 17, 64; Horne Dep. at 12, 16.  On one occasion, the manager approached the girls to ask if they needed assistance.  Windmon at 14.  The girls declined. While they were shopping, the girls were briefly joined by two other girls, Tasha Robinson and "Kin Kin."  Horne Dep. at 82.  Robinson and her companion left Plaintiffs and entered the dressing room.  At this time, Stewart stopped watching Plaintiffs and followed Robinson and Kin Kin.  Exhibit 4, Benton Charter Township Police Report (the "Police Report"), Corp. Sec. Mot. Part. Summ. J. (Docket #95); Windmon Dep. at 52, Horne Dep. at 88.

J.C. Penney does not dispute the watchfulness of their employees.  Janice Lamunion, a J.C. Penney employee on duty during the evening of February 12, 2004, explained that she

---

Windmon agree that, when the four girls were together, they immediately returned to J.C. Penney.  King Dep. at 15; Windmon Dep. at 8, 50.  Horne, however, testified that the four girls shopped together throughout the mall and J.C. Penney was the last store they entered. Horne Dep. at 76-77.  These factual variations are not material to the Court's disposition to this case.

began observing the girls because she recognized King's green coat and believed that King had been involved in suspicious activity in the store the previous week. Lamunion Aff. ¶¶ 6, 7. Due to her suspicion, she contacted Stewart and informed him that the group included a girl that she believed had been previously involved in shoplifting. ¶ 8. Thereafter, Stewart began observing Plaintiffs. The Police Report.[3]

After being watched for approximately thirty minutes, Plaintiffs decided to leave the store because they were uncomfortable with the scrutiny. King Dep. at 17; Windmon Dep. at 14. As the girls were exiting the store into the mall, three mall security guards, employed by Corporate Security Solutions, stopped the girls and explained that they received a radio call from Stewart that the girls were involved in shoplifting and would need to return to the store. Hopkins Dep. at 19; King Dep. at 18; Windmon Dep. at 19; Horne Dep. at 19. Justin Hopkins, one of the security guards who detained the girls, explained that Stewart summoned the guards based on his suspicion that the girls were involved in shoplifting. Hopkins Dep. at 19-20; the Police Report. Hopkins also testified that Stewart provided a description of the girls' clothing, but could not recall if Stewart indicated Plaintiffs' race. Hopkins Dep. at 27-28. After Plaintiffs were detained, Stewart asked that the security guards escort them to the

---

[3]King has filed an affidavit stating that, prior to February 12, 2004, she had not visited the Orchards Mall since December 2003. Nevertheless, it is not disputed that Lamunion suspected King or that this suspicion prompted her to report to Stewart. King's affidavit will be addressed more fully below.

security office to await the arrival of a Benton Township police officer.  Hopkins Dep. at 31;

Police Report.

The security office was located in the center of the mall.  According to Plaintiffs,

while en route to the office the security guards would not answer their questions and

continually ordered them to go to the security office.  As the group walked, Danishia

Counce's mother, Nichelle Counce, and Richie Counce, her grandfather, joined the group

after the security guards explained that the girls had been detained for shoplifting in J.C.

Penney.

While there is some immaterial dispute, upon arriving at the office, the occupants of

the room during this incident included at least five security guards, the four girls, and

Ms. Counce.  Richie Counce remained outside the office door.  While the girls were in the

office, Stewart also arrived with two other J.C. Penney employees.  Plaintiffs were not

allowed to call their parents and were not permitted to leave the office until the police

arrived.  During the detainment, Stewart directly accused King of shoplifting.  An

unidentified J.C. Penney employee also alleged that she had heard price tags being torn off

in the dressing room that evening and claimed that she had observed King shoplifting in the

store the previous week.  Windmon Dep. at 58, 60; King Dep. at 30, 61; Horne Dep. at 99.

Although Plaintiffs maintained their innocence, the accusations upset King and she began

to cry.

Although Plaintiffs were prohibited from calling their parents, King was able to surreptitiously place a call on her cellular phone to her stepfather alerting him to her detention. When her stepfather arrived, he requested entry into the security office. While the parties dispute the reason, he was not permitted to enter. Hopkins testified that he answered the door when King's stepfather knocked and observed that he was very upset. Hopkins Dep. at 41. Hopkins decided that, due to the father's attitude, it was not safe to allow him in the security office until the police arrived. Hopkins Dep. at 41. Plaintiffs tell a different story. According to Plaintiffs, when King's stepfather arrived he attempted to enter the office but the door was closed in his face. While the door was being shut, Stewart commented, "we're not having the whole damned Benton Harbor in here." King Dep. at 43; Windmon Dep. at 80-81; Horne Dep. at 33. Because this case is before the Court on summary judgment, the Court will assume that Plaintiffs' version is correct and that Stewart made the comment about Benton Harbor.

Officer Greg Adams of the Benton Township police department responded to the incident, arriving at the mall at approximately 7:55 p.m. Adams Dep. at 9-10. Upon his arrival he interviewed Stewart, discovering that the J.C. Penney employees began watching Plaintiffs after an employee informed Stewart that she recognized King from a previous shoplifting incident. Benton Charter Township Police Report; Adams Dep. at 16. Stewart also explained that after seeing Plaintiffs with Robinson and Kin Kin, he observed the two girls removing price tags from clothing in the dressing room. Adams Dep. at 16-17. These

6

price tags were provided to Officer Adams.[4]  After completing Stewart's interview, Adams then briefly questioned all four girls before requesting that Nichelle Counce assist him in conducting a search of each girl.

Adams and Counce then used a small room in the office to conduct the searches. Counce searched each girl, while Adams observed and asked questions.  No stolen merchandise was recovered during the search.  Based upon the interviews and searches, Adams determined that, while it appeared that shoplifting had occurred, the girls did not appear to be involved.  Adams then allowed the girls to leave.  King left with her stepfather, while the other three girls left with Counce.

Following the incident, Stewart was dismissed from his employment on February 19, 2004.  Clyde Jack, the J.C. Penney store manager, terminated Stewart after reviewing Stewart's report and conducting an interview with him. Jack Dep. at 40.  Jack determined that Stewart did not follow J.C. Penney's loss prevention policy.  Jack Dep. at 40. Specifically, Stewart never saw Plaintiffs take merchandise, he failed to keep Plaintiffs in sight at all times, and he unnecessarily called mall security.  Jack Dep. at 40; Reason for Dismissal.

As a result of this incident, Plaintiffs brought suit against J.C. Penney, Corporate Security, and Sequoia, the owner of Orchards Mall and J.C. Penney's landlord, alleging a

---

[4]Apparently, Plaintiffs and their parents did not see the discarded price tags on that evening.  King Dep. at 52; Nichelle Counce Dep. at 24.

federal claim under 42 U.S.C. § 1981 as well as defamation, intentional infliction of emotional distress, and false imprisonment. Before the Court are Defendants' motions for summary judgment on Plaintiffs' claims.

## II.

Summary judgment is appropriate when the record reveals that there are no issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Kalamazoo Acquisitions, L.L.C. v. Westfield Ins. Co.*, 395 F.3d 338, 342 (6th Cir. 2005); *Layne v. Bank One, Ky, N.A.*, 395 F.3d 271, 275 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Tucker v. Union of Needletrades, Industrial and Textile Employees*, 407 F.3d 784, 787 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The Court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in the favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Minadeo v. ICI Paints*, 398 F.3d 751, 756 (6th Cir. 2005).

Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the non-moving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Although the facts are viewed in the light most favorable to the non-movant, they may not

rest on the mere allegations of his pleadings.  FED. R. CIV. P. 56(e); *Daniel v. Cantrell*, 375 F.3d 377, 381 (6th Cir. 2004).  "A mere scintilla of evidence is insufficient."  *Humenny v. Genex Corp.*, 390 F.3d 901, 904 (6th Cir. 2004).  Rather, a party with the burden of proof opposing a motion for summary judgment has the burden to come forth with requisite proof to support his legal claim, particularly where he has had an opportunity to conduct discovery. *See Cardamone v. Cohen*, 241 F.3d 520, 524 (6th Cir. 2001).

III.

A.     *42 U.S.C. § 1981*

Because the Court's jurisdiction is dependent upon the validity of the federal claim, the analysis will begin with Plaintiffs' § 1981 claim.[5]  Section 1981 protects various fundamental civil rights from intentional race discrimination.  *See* 42 U.S.C. § 1981; *Amini v. Oberlin College*, 440 F.3d 350, 358 (6th Cir. 2006).  The statute provides:

> (a) Statement of equal rights.  All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as

---

[5]Plaintiffs' complaint asserts that the Court's subject matter jurisdiction is based upon 28 U.S.C. §§ 1331 (federal question), 1332 (diversity), and 1343 (civil rights).  Both Section 1331 and 1343 grant the Court original jurisdiction over Plaintiffs' federal civil rights claim. Section 1332, however, is not applicable because Plaintiffs' have joined a non-diverse defendant, Corporate Security.  As such, diversity jurisdiction is obviously lacking.  *See Peters v. Fair*, 427 F.3d 1035, 1038 (6th Cir. 2005) ("[D]iversity jurisdiction requires that no party share citizenship with any opposing party.") (citing *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806); *Safeco Ins. Co. of Am. v. City of White House*, 36 F.3d 540, 545 (6th Cir. 1994)).  Consequently, the Court's jurisdiction hinges upon the validity of Plaintiffs' federal claim.

9

is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined.  For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment.  The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.  Plaintiffs have alleged that Defendants, through the surveillance and detainment on suspicion of shoplifting, violated both the "make and enforce contracts" and "full and equal benefit" clauses of § 1981.  Each claim will be addressed in turn below.

1.    *The Make and Enforce Contracts Clause*

Although it is not clear from the allegations of Plaintiffs' complaint, the contract claim appears to be confined to J.C. Penney and Sequoia.  *See* Pl.'s Res Br. (Docket #108).  Most litigation involving § 1981 arises from the right to make and enforce employment contracts. *See Morris v. Office Max*, 89 F.3d 411, 413 (7th Cir. 1995) (collecting cases).  The statute, however, is not limited to employment matters.  *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 304 (1994) "[Section 1981] is not limited to employment, because it covers *all* contracts."). Courts, including the Sixth Circuit, have applied the contracts clause to situations involving a retail establishment similar to this case.  *See e.g.*, *Christian v. Wal-Mart Stores*, 252 F.3d 862 (6th Cir. 2001); *Garrett v. Tandy Corp.*, 295 F.3d 94 (1st Cir. 2002); *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091 (10th Cir. 2001); *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743 (5th Cir. 2001).

In order to prevail in a § 1981 racial discrimination claim based upon circumstantial evidence, a plaintiff must meet the burden-shifting standard for Title VII cases established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Christian*, 252 F.3d at 868.[6]  Under this standard, Plaintiffs first must present a prima facie case of discrimination by a preponderance of the evidence.  *Christian*, 252 F.3d at 868.  The burden then shifts to Defendants to articulate a legitimate, non-discriminatory reason for their actions.  *Id.*; *Amini*, 440 F.3d at 359.  Plaintiffs must then show that Defendants' proffered reason is not the true reason, but a pretext for discrimination.  *Id.*; *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003).  "Throughout the analysis, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Amini*, 440 F.3d at 360 (quoting *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

---

[6]Although Plaintiffs contend that there is direct evidence of intentional discrimination, they have analyzed their claim under the burden-shifting standard set forth in *McDonnell Douglas*.  Moreover, the claim that they have direct evidence of discrimination is suspect and appears to be a misunderstanding of what constitutes "direct evidence" of discrimination. As recently defined by the Sixth Circuit, direct evidence "is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the [defendant's] actions.  *It does not require the fact finder to draw any inferences to reach that conclusion . . . Evidence of discrimination is not considered direct evidence unless a racial motivation is explicitly expressed.*"  *Amini*, 440 F.3d at 359 (emphasis added) (citations omitted).  None of the evidence offered by Plaintiffs in support of their claim explicitly expresses a racial motivation.  Moreover, as will be discussed below, Plaintiffs' supporting evidence requires a number of inferences in order to reach the conclusion that Defendants' actions were motivated by racial discrimination.

In *Christian*, the Sixth Circuit adopted a three-part prima facie test for evaluating contracts clause claims in the commercial establishment context.  252 F.3d at 870, 872.  A plaintiff must prove:

> (1) plaintiff is a member of a protected class;
> (2) plaintiff sought to make or enforce a contract for services ordinarily provided by the defendant; and
> (3) plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.

*Christian*, 252 F.3d at 872; *see also Callwood v. Dave & Buster's, Inc.*, 98 F. Supp. 2d 694, 705 (D. Md. 2000).  There is no dispute that Plaintiffs are members of a protected class.  Accordingly, the Court will turn to an evaluation of the second and third prongs of the prima facie case.

The second prong requires that Plaintiffs' prove that they sought to make or enforce a contract for services ordinarily provided by the Defendant.  *Christian*, 252 F.3d at 872.  Plaintiffs principal argument on this prong is that they were engaged in "predicate activity to contract formation" and that such pre-contract activity is protected under the statute.  Although Plaintiffs have supplied the Court with a thorough review of the historical development of § 1981, they have provided little in the way of authority directly supporting this expansive view.

Congress amended § 1981 to include subsection (b), defining the term "make and enforce contracts," in response to the Supreme Court's decision in *Patterson v. McLean*

*Credit Union*, 491 U.S. 164 (1989). *See Rivers*, 511 U.S. at 307-09 (describing amendment of § 1981). Section 1981(b) defines "make and enforce contracts" as "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Plaintiffs argue that their actions fall under the "making" portion of subsection (b). Recently, the Supreme Court reaffirmed its view that § 1981 protects contract rights under already existing contracts as well as the rights of "would-be contractors." *Domino's Pizza, Inc. v. McDonald*, 126 S. Ct. 1246, 1249-50 (Feb. 22, 2006) (citing *Runyon v. McCrary*, 427 U.S. 160 (1976)). Although the statute's protections apply to those who would enter a contract, in order to prevail a plaintiff must identify a particular contract which they sought to enter but were prevented from doing so for racially-motivated reasons. *Id.* at 1250 (quoting *Runyon*, 427 U.S. at 172); *Christian*, 252 F.3d at 872 (holding that plaintiff must show that he/she "sought to make or enforce a contract for services ordinarily provided by the defendant."); *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001) ("The requirement remains that a plaintiff must point to some contractual relationship in order to bring a claim under Section 1981."); *Lewis v. J.C. Penney Co., Inc.*, 948 F. Supp. 367 (D. Del. 1996) (holding that, in order to establish a contract claim under § 1981, "plaintiff must point to some contractual relationship with [defendant] in order to bring her claim.")).

13

The Sixth Circuit has not addressed the precise boundaries of the "make and enforce contracts" clause. In *Christian*, the court indicated that in order to satisfy the clause in the commercial context, a plaintiff must show that "she intended to make a purchase and was asked to leave the establishment in order to prevent her from making the purchase on account of her race . . . ." 252 F.3d at 873 (citing *Watson v. Fraternal Order of Eagles*, 915 F.2d 235, 243 (6th Cir. 1990)). The court also concluded that it had "no trouble" finding the plaintiff sought to enter into a contract ordinarily provided by the defendant store. *Id*. at 874. The court noted that plaintiff "had selected merchandise to purchase, had the means to complete the transaction, and would, in fact, have completed her purchase had she not been asked to leave the store." *Id*.

Other courts that have considered the clause have held that a plaintiff must allege interference with an actual, as opposed to speculative, contract interest. In *Morris v. Office Max*, 89 F.3d 411 (7th Cir. 1996), two African-American men entered an Office Max store a few minutes before closing time. While the two men were innocently browsing, a store clerk telephoned the police to report "two male blacks acting suspiciously." *Office Max*, 89 F.3d at 412. Prior to the arrival of the police, one of the men selected certain merchandise and made a purchase. After making his purchase, he rejoined his companion in the store. When the police arrived, they briefly questioned the men and determined that there was nothing amiss. The two men sued, contending that the store violated the "make and enforce contracts" clause. The Seventh Circuit denied their claim because there was no evidence that

14

the store had violated § 1981.  "They were denied neither admittance nor service, nor were they asked to leave the store."  *Id*. at 414.  Further, the court rejected the plaintiffs claim that the store interfered with their "prospective contractual relations," concluding that their claim was "speculative and insufficient to state a claim under § 1981.  A claim for interference with the right to make and enforce a contract must allege the actual loss of a contract interest, not merely the possible loss of future contract opportunities."  *Id*. at 414-15.

Similarly, in *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1117-18 (10th Cir 2001), the Tenth Circuit rejected an African-American woman's § 1981 claim that her ejection from a store was racially-motivated because she failed to show that she planned or attempted to make a purchase at the store.  The court refused to extend § 1981 "beyond the contours of a contract" and held that "there must have been interference with a contract beyond the mere expectation of being treated without discrimination while shopping."  *Hampton*, 247 F.3d at 1118.  *See also Phelps v. Wichita Eagle-Beacon*, 886 F.2d 1262, 1267 (10th Cir. 1989) (upholding dismissal of § 1981 claim where plaintiff alleged the "*possible* loss of *future* [contract] opportunities.") (emphasis in original).

Finally, in *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 751-53 (5th Cir. 2001), the Fifth Circuit upheld the district court's grant of summary judgment in favor of the store on plaintiff's § 1981 claim.  Plaintiff had been browsing in the store when a store employee alerted security that she suspected plaintiff of shoplifting.  The security officer followed plaintiff to the parking lot and copied down her license plate.  Plaintiff returned to the store

to confront the security officer.  At that time she was accused of shoplifting, arrested, searched and temporarily banned from the store.  *Morris*, 277 F.3d at 746-47, 751.  In analyzing plaintiff's § 1981 claim, the court held that she was required to "establish the loss of an actual, not speculative or prospective, contract interest." *Id*. at 751.  The court held that there was no evidence indicating that plaintiff "made any tangible attempt to purchase, or to return, specified goods at the store, or to enter any other contractual agreement with Dillard's, at any time during the course of the ban." *Id.*. at 753.  Accordingly, her claim was denied.

In this case, Plaintiffs have failed to identify an actual contract they sought to enter with J.C. Penney.  Beyond the fact that Plaintiffs were browsing in J.C. Penney for a significant period of time, there is no evidence that they sought an actual contract relationship with J.C. Penney.  *See Morris*, 277 F.3d at 151 ("a plaintiff must establish the loss of an actual, not speculative or prospective, contract interest.") (citing *Bellows v. Amoco Oil Co.*, 118 F.3d 268, 274 (5th Cir. 1997)).  Something more than simply being present in a retail store must be alleged to state a claim under § 1981.  *Christian*, 252 F.3d at 873 ("plaintiff need only show that she *intended to make a purchase* and was asked to leave the establishment in order to prevent her from making the purchase on account of her race.") (emphasis added) (citing *Watson*, 915 F.2d at 243).  Plaintiffs have failed to point to any evidence in the record indicating that they intended to make a purchase at J.C. Penney.  They did not select any merchandise, did not attempt to make a purchase, and have not even shown that they would have purchased items had they not decided to leave.  *Christian*, 252 F.3d at

16

874 (holding that plaintiff satisfied second prong because she had selected merchandise, had the means to complete the transaction, and would have completed the transaction if she had not been asked to leave the store); *Hampton*, 247 F.3d at 1118 (rejecting plaintiff's claim because she failed to show she made or attempted to make a purchase); *Morris*; 277 F.3d at 753 (upholding summary judgment in favor of retail store where evidence of "any tangible attempt to purchase . . . or to enter any other contractual agreement" with the store was lacking).  Each girl testified that they simply looked at clothing for approximately thirty minutes before deciding to leave.  Horne Dep. at 13-14, 17; Windmon at 10, 14; King at 17, 64; Counce at 10-11.  In fact, one of the plaintiffs, Horne, testified that she decided to leave the store because "I just felt like I wanted to leave.  *And I didn't find nothing in there anyway*."  Horne Dep. at 92 (emphasis added).  This is a far cry from seeking an actual contract with J.C. Penney.

The only evidence that arguably points to a possible contract is King's brief statement that she and her friends returned to J.C. Penney because she wanted to show them "what we picked."  King Dep. at 77.  There is no additional evidence, however, indicating the actions King took beyond apparently showing her friends a certain item.  King Dep. at 63.  For example, there is no evidence that any of the girls tried on the merchandise, had the merchandise in hand to purchase, or approached a cashier to purchase the item.  *Morris*, 277 F.3d at 752 (noting that "where a customer has engaged in an actual attempt to contract that was thwarted by the merchant, courts have been willing to recognize a § 1981 claim.") (citing

*Christian*, 252 F.3d at 874).  The testimony that King "picked" an item, standing alone, is insufficient to create a genuine issue of material fact for submission to the jury.[7]  *See e.g.,* *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) ("The nonmovant [on summary judgment] must [present] sufficient evidence on which the jury could reasonably find for him; '*[a] mere scintilla of evidence is insufficient*' to meet this burden.") (emphasis added) (quoting *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000)).

Moreover, Plaintiffs' argument that "predicate activity," such as window shopping or browsing merchandise, is protected under § 1981 is unavailing.  Plaintiffs have not offered any authority from any court supporting their theory.  In fact, numerous courts have rejected similar speculative claims.  *Garrett*, 295 F.3d at 100, 102 (noting that the 1991 amendment did not convert § 1981 into a "general prohibition against race discrimination" and concluding that a § 1981 claimant "must allege the actual loss of a contract interest, not simply the theoretical loss of a possible future [contract opportunity]."); *Morris*, 277 F.3d at

---

[7]At oral argument, Plaintiffs' also asserted that they left J.C. Penney because one of the girls needed money to purchase an item.  The only reference to this event is in the police report which explains that "they left out of the store to go find Nischelle Counce because her daughter Danisha Counce needed to get some money from her to buy something."  Police Report.  This evidence is irrelevant to Plaintiffs' claims and does not support the denial of summary judgment.  The rights protected under § 1981 are *individual* civil rights.  Counce is not a plaintiff in this case, consequently, the fact that she may have found something to purchase does not remedy the absence of evidence to support Plaintiffs' attempt to contract. *See Hampton*, 247 F.3d at 1103-04, 1117-18 (distinguishing between the § 1981 claims of two shopping companions and holding that one plaintiff who entered into a contract with defendant stated a claim, while her companion, who made no attempt to purchase merchandise, did not have a valid claim).

751-52 ("[P]laintiff must establish the loss of an actual, not speculative or prospective, contract interest."); *Hampton,* 247 F.3d at 1118 ("[W]e cannot extend § 1981 beyond the contours of a contract.  We are aligned with all the courts that have addressed the issue that there must have been interference with a contract beyond the mere expectation of being treated without discrimination while shopping.");  *Office Max*, 89 F.3d at 414 (rejecting, as speculative, plaintiff's claim that § 1981 applied to "prospective contractual relations" and concluding that plaintiff "must allege the actual loss of a contract interest, not merely the possible loss of future contract opportunities."); *Lewis*, 948 F. Supp. at 371 ("[P]laintiff must point to some contractual relationship with J.C. Penney in order to bring her claim," and rejecting plaintiff's "nebulous contract theory" of an unwritten contract between retail establishments and the public that those who enter will be free from discrimination).  Plaintiffs have failed to establish a necessary prong of the prima facie case under § 1981.  Accordingly, J.C. Penney is entitled summary judgment on Plaintiffs' contract claim.[8]

---

[8]There is no evidence supporting Plaintiffs' claim that they sought to contract with Sequoia, J.C. Penney's landlord and the owner of the mall.  This claim suffers from many of the same difficulties as Plaintiffs' claim against J.C. Penney.  For example, Plaintiffs' claim appears to be premised on the fact that they were present in an area owned by Sequoia.  As set forth above, in order to satisfy their prima facie case, Plaintiffs must point to an actual contract interest beyond simply being in a retail establishment.  Plaintiffs have not pointed to any evidence in the record indicating that they sought an actual contract interest with Sequoia.  Moreover, there is no evidence that an employee of Sequoia took *any* action, let alone intentionally discriminatory action, that denied Plaintiffs' right to make and enforce a contract.  Consequently, summary judgment is also granted in favor of Sequoia on the contract claim.

Even assuming that Plaintiffs' could demonstrate that they sought an actual contract with J.C. Penney, they failed to adduce evidence creating a genuine issue of material fact on the third prong of the *Christian* test.  Plaintiffs must prove that they were "deprived of services while similarly situated persons outside the protected class were not and/or that [they] received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory." *Christian*, 252 F.3d at 874.

It is undisputed that Plaintiffs were watched, at times closely, while they were shopping together in J.C. Penney.  At least one and as many as four J.C. Penney employees watched them while they shopped.  Windmon Dep. at 11, 13, 66; King Dep. at 17, 79-80; Horne Dep. at 12-13, 107, Counce Dep. at 42.  There is also no dispute that Stewart and a manager remained in close proximity to the girls as they shopped.  At one point even asking if the girls needed assistance.  Windmon at 14, Horne Dep. at 17.  After being watched for approximately thirty minutes, the girls decided to leave and continue shopping elsewhere in the mall.  The girls also testified that they felt the scrutiny was racially motivated.  Horne testified that "[w]e felt that we were only being watched because -- it was white people in there, too.  They weren't getting watched.  And we were black.  So everyone was watching us." Horne Dep. at 13.  King explained that "[w]e were the only black girls in the store.  And when there was other girls walking around in the juniors section they were white.  And if they were to steal something they probably wouldn't have even noticed because they . . . had

all they're attention on us."  King Dep. at 70.  Finally, Windmon simply explained, "[i]t's a black-and-white situation.  They were watching too much."  Windmon Dep. at 14.

Nothing in this record reveals that Plaintiffs were denied services while similarly situated persons outside the protected class were not.  Nor do the actions of the J.C. Penney employees rise to the level of markedly hostile or objectively discriminatory treatment.[9] Plaintiffs have alleged that they were watched while they were in the J.C. Penney's junior section.  After being watched for thirty minutes, they left the store.  There is nothing markedly hostile, however, about a store employee watching a customer.  *Garrett*, 295 F.3d at 101 (denying plaintiff's § 1981 claim where he alleged that he was watched closely while in defendant's store).  As the First Circuit cogently observed, "[i]n a society in which shoplifting and vandalism are rife, merchants have a legitimate interest in observing customers' movements.  So long as watchfulness neither crosses the line into harassment nor impairs a shopper's ability to make and complete purchases, it is not actionable under section 1981."  *Id.*, 295 F.3d at 101.  J.C. Penney's employees' close observation of Plaintiffs does

---

[9]The Court will address Plaintiffs' detainment in the following section on the "full and equal benefit" clause claim.  The watchfulness and the detainment are separate issues addressing different aspects of § 1981.  The detainment is not relevant to the contract claim because, prior to the stop, the girls left the store and were not seeking to contract with J.C. Penney.  *Cf. Youngblood*, 266 F.3d at 854 (holding that defendant did not violate "make and enforce" clause where customer was stopped while exiting store after making a purchase because, following the sale, there was no further contractual duty on defendant's part).  Conversely, the watchfulness of J.C. Penney's employees is not relevant to the "full and equal benefit" claim because nothing about the observation of Plaintiffs denied the girls the benefit of a law or proceeding "for the security of persons and property . . . ."  42 U.S.C. § 1981(a).

not "cross[] the line into harassment." *Id*. For example, Plaintiffs were not denied entrance or service in the store, they were not interfered with while they shopped, they were not precluded from making purchases, and they were not asked to leave. *Watson* 915 F.2d at 243 (holding that defendant's request that plaintiff leave its establishment constituted a violation of § 1981); *Office Max*, 89 F.3d at 414 (denying § 1981 claim where plaintiffs "were not denied admittance or service, nor were they asked to leave the store.").

Moreover, this case presents a marked contrast to the actions that the Sixth Circuit in *Christian* found to have created an "inference of discrimination" sufficient to establish the third prong of the prima facie case. The court detailed five specific actions, only one of which was watching and following a customer, taken by defendant that satisfied the "markedly hostile" treatment prong of the prima facie case. *Christian*, 252 F.3d at 874-75 (noting that store employee watched and followed plaintiff, offered plaintiff assistance six times, while not offering to help plaintiff's white companion, watched plaintiff's companion only after realizing the two were together, reporting a shoplifting incident which did not occur, and ordering the removal of plaintiff's companion because she was with plaintiff). In contrast to *Christian*, Plaintiffs were watched and on one occasion were offered assistance. This activity on the part of J.C. Penney's employees, without more, is not sufficient to satisfy the third prong of the prima facie case under § 1981. Further, the allegation that the employees observed Plaintiffs while white shoppers were not scrutinized, even if accepted as true, does not indicate that Plaintiffs were deprived of services while similarly situated

22

white customers were not.  A merchant's observation of a customer is not equivalent to a denial of services.  *See Hampton*, 247 F.3d at 1108 (holding that evidence of discriminatory surveillance, on its own, is not actionable under § 1981); *Lewis*, 948 F. Supp. at 371 (rejecting plaintiff's claim of an "unwritten contract between commercial establishments and the public, that all who enter premises of the former will be treated equally regardless of race.").

Plaintiffs' reliance on their subjective, uncomfortable feeling while shopping is also misplaced.  King Dep. at 17; Windmon Dep at 14.  The third prong of the *Christian* test requires proof of a denial of services in a discriminatory manner or markedly hostile treatment by the defendant. 252 F.3d at 872.  This standard is plainly focused on the actions of the defendant, not the subjective feelings of the plaintiff.  *See Christian*, 252 F.3d at 874-75 (evaluating the "discriminatory acts" of defendant's employee under the third prong of the prima facie test); *Watson*, 915 F.2d at 243 (defendant's request that plaintiff leave its commercial establishment sufficient to constitute a violation of § 1981).  Focusing on the defendant's discriminatory actions, rather than the plaintiff's subjective notions, is consistent with § 1981's requirement of proof of intentional discrimination by the defendant.  *See e.g.*, *General Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982).  Therefore, evidence demonstrating that Plaintiffs may have felt uncomfortable in J.C. Penney does not address the relevant issue of whether the Defendant's actions denied Plaintiffs the right to enter into or enjoy a contractual relationship.  *Christian*, 252 F.3d at 872.  Accordingly,

Plaintiffs have failed to establish the prima facie case necessary to state a claim of a violation of the right to make and enforce a contract under § 1981.

Plaintiffs also rely on Stewart's alleged statement that the girls not return to J.C. Penney. Reliance on this event is also misplaced. The evidence addressing this event is limited. Windmon testified that she did not recall anyone telling them not to come back. Windmon Dep. at 56. King provided the most thorough account of the incident, explaining that as she and Horne exited J.C. Penney on their way to meet the two other girls, they saw Robinson and Kin Kin. King Dep. at 28. King testified that they were trailing behind the other girls as they exited the store when Stewart told the girls not to return. *Id*. King continued, "me and Jamicia automatically thought that he was talking to Tasha and Kin Kin." *Id*. at 28, 59. The police report is also consistent with King's version of events, noting that "someone from security advised [Plaintiffs] not to return" as they were leaving the store. Police Report. The report continues, "they (Plaintiffs) thought security was talking to Tasha Robinson and "Ken Ken" [sic] and did not pay attention to what security had said." Horne is the only plaintiff that testified that Stewart told them not to return. Horne Dep. at 37.

Even assuming that Plaintiffs were told not to come back to J.C. Penney, this does not support their claim because this action did not interfere with their right to enter into or enjoy a contractual relationship with J.C. Penney. While it appears that the girls did not think that Stewart's comment applied to them, it is clear that even if the comment was made, the comment did not effect their behavior. Specifically, it did not preclude them from returning

to J.C. Penney and shopping in the store that same day.  As stated previously, upon their return to the store they were not prohibited from entering, nor refused service, prevented from making purchases, or asked to leave.  Rather, they shopped in J.C. Penney until they decided to continue on to another store.

Finally, the Court briefly notes that had Plaintiffs established a prima facie case of racial discrimination, they have failed to prove that J.C. Penney's reason for its surveillance was a pretext for discrimination.  *See e.g.*, *Christian*, 252 F.3d at 879 (describing the burden-shifting framework applicable to § 1981 cases).  J.C. Penney asserts that its legitimate reason for watching Plaintiffs was that its employees suspected King of shoplifting on a prior occasion.  *See* Lamunion Aff. ¶¶ 6-8.  The Court must accept this reason because J.C. Penney has the burden of production, not persuasion.  *Christian*, 252 F.3d at 879.  While Plaintiffs assail the non-discriminatory reason given as a "post hoc fabrication," they have not provided any evidence, beyond the mere allegation, from which the Court could conclude that Lamunion's observation was a fabrication.

Plaintiffs also rely on King's affidavit stating that prior to February 12, 2004, she had not been in J.C. Penney since December 2003.  While King's affidavit appears to contradict Lamunion's statement, it does not create a genuine issue of material fact on the issue of pretext.  Even if King's testimony is accurate, and Lamunion misidentified King, this does not undermine J.C. Penney's non-discriminatory reason for observing Plaintiffs.  Lamunion's affidavit is not offered to prove that King was *actually* in J.C. Penney shoplifting during the

week before February 12, 2004.  Rather, it is offered to show her reason for being suspicious

and reporting to Stewart.  King's affidavit does not dispute Lamunion's reason or the fact that

she reported her suspicion to Stewart.  Moreover, whether Lamunion's identification was

right or wrong, it provided a non-discriminatory basis for observing Plaintiffs. And Plaintiffs

have failed to offer any evidence indicating that the suspicion was a pretext for

discrimination.  Consequently, Plaintiffs have failed to meet their burden of establishing that

J.C. Penney's non-discriminatory reason was a pretext for discrimination.

2.     *The Full and Equal Benefit Clause*

The Court now turns to Plaintiffs' claim based upon § 1981's full and equal benefit

clause.  This claim is asserted against each of the three remaining Defendants.  Few courts

have analyzed the equal benefits clause, particularly in this specific, retail context. *Pierre v.*

*J.C. Penney Co., Inc.*, 340 F. Supp. 2d 308, 310 (E.D.N.Y. 2004) (describing the "dearth of

case law regarding the 'equal benefit' clause" but applying the clause to a shoplifting

incident) (quoting *Felton v. Maines Cash & Carry, Inc.*, No. 00-CV-239, 2001 WL 118594

(N.D.N.Y. Feb. 2, 2001)).  The clause generally has been applied in the context of racially

motivated arrests and searches made in the absence of probable cause.  *See e.g.*, *Mahone v.*

*Waddle*, 564 F.2d 1018, 1028 (3d Cir. 1977); *Cunningham v. Sisk*, No. 1:01-CV-182, 2003

WL 23471541, *16 (E.D. Tenn. Dec. 4, 2003) (collecting cases); *Mendez v. Rutherford*, 687

F. Supp. 412, 416 (N.D. Ill. 1988) ("Racially-motivated arrests, beatings and searches made

in the absence of probable cause easily fall within the wording of § 1981."); *Spriggs v. City*

26

*of Chicago*, 523 F. Supp. 138, 146-47 (N.D. Ill. 1981) (finding that a claim of racially motivated police brutality "fit[s] comfortably within the statute's literal boundaries").

Section 1981(a) guarantees "the same right . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981. Section 1981(c) provides that this right is "protected against impairment by nongovernmental discrimination and impairment under color of State law." Although there is some dispute between the circuits, the Sixth Circuit has held that the equal benefit clause applies to private acts of discrimination. *Chapman v. Higbee Co.*, 319 F.3d 825, 833 (6th Cir. 2003); *see also Phillip v. Univ. of Rochester*, 316 F.3d 291, 295 (2d Cir. 2003) (holding that state action is not required for a "full and equal benefit" clause claim but noting that "there must be some nexus between a claim and the state or its activities . . . ."); *but see Brown v. Philip Morris, Inc.*, 250 F.3d 789 (3d Cir. 2001) (limiting equal benefit clause to suits against state actors); *Youngblood*, 266 F.3d at 855 (same).

*Chapman* involved a suit against Dillard's Department Store after a Dillard's security officer stopped and searched plaintiff under suspicion of shoplifting. Plaintiff alleged that the episode was racially motivated and violated the equal benefit clause. The Sixth Circuit did not address the merits of plaintiff's § 1981 claim, confining its analysis to the question of whether § 1981 provided a cause of action against a private party under its equal benefit clause. *Chapman*, 319 F.3d at 828. Relying on the "plain language" of § 1981(c), the Court held that the statute unambiguously applied to the actions of private parties. *Id.* at 829-30.

27

Although *Chapman* made clear that the equal benefit clause applied to the actions of private parties, like Defendants in this case, it did not address the elements required to establish a claim under the clause. Each of the parties has provided the Court with their own version of a three-part test addressing the claim. Plaintiffs contend that the Court should adopt the elements articulated by the Second Circuit in *Phillip v. Univ. of Rochester*, 316 F.3d 291 (2d Cir. 2003). Namely, that a plaintiff establish 1) racial animus, 2) a relevant law or proceeding for the "security of persons and property;" and 3) that defendant deprived plaintiff of the "full and equal benefit" of that law. *Phillip*, 316 F.3d at 298. Defendants assert that the Court should apply the following three elements: 1) Plaintiffs are a member of a racial minority; 2) Defendants acted with intent to discriminate against Plaintiffs on the basis of race, and 3) the intentional race discrimination concerned one or more of the enumerated rights in § 1981(a). *See Cunningham*, 2003 WL 23471541, *16, *see also Amini*, 440 F.3d at 358. Whether the Court adopts the elements favored by Plaintiffs or Defendants, the dispositive issue in this case is the element shared by both tests: whether Plaintiffs can establish intentional discrimination.

The evidence supporting Plaintiffs' claim involves their stop and detention upon leaving J.C. Penney. Plaintiffs were stopped by mall security officers employed by Corporate Security. The security officers had been summoned to J.C. Penney by Stewart to assist in detaining Plaintiffs. Hopkins Dep. at 19-20. The guards stopped and detained Plaintiffs based upon a description of their clothing provided by Stewart. Hopkins Dep. at 27-28.

According to the police report, Stewart requested the assistance of the security guards after he had ceased watching Plaintiffs and observed Robinson and Kin Kin in the dressing room removing tags from clothing.  Police Report, Adams Dep. at 18.  Apparently, Stewart believed that Plaintiffs may have been involved with the two girls.[10]  Police Report, Adams Dep. at 17-18.  After Plaintiffs were detained, the Corporate Security officers escorted them to the security office.  Hopkins Dep. at 31.  While the group was waiting for the arrival of the police, King's stepfather attempted to enter the office but was not permitted to do so.  Although disputed, the Court will assume that during the incident with King's stepfather, Stewart made the statement, "we don't want the whole damned Benton Harbor in here."  Finally, Plaintiffs contend that the stop and detention violated both the J.C. Penney loss prevention policy and Corporate Security's procedural manual.[11]

The equal benefit claim against Corporate Security can be quickly dispensed with. The record is devoid of any evidence indicating that the actions of Corporate Security's employees were racially motivated.  In fact, Corporate Security's role in the stop and

---

[10]There is a small amount of evidence justifying Stewart's suspicion that Plaintiffs were involved with the two other girls.  Officer Adams' investigation revealed that Stewart observed Plaintiffs, Robinson and Kin Kin together in J.C. Penney before seeing the pair in the dressing room.  Adams Dep. at 16-17.  Plaintiffs also indicated that the two other girls briefly joined them while in J.C. Penney.  Horne Dep. at 82-84.

[11]Plaintiffs also assert that both Lamunion's affidavit detailing the reason the surveillance began and the police report's mention of the discovery of discarded price tags in the dressing room are fabrications.  Plaintiffs allege that these "fabrications" lend further support to their equal benefit claim.  Apart from the allegation itself, Plaintiffs have not provided any credible evidence to support their accusation.  Consequently, the Court will disregard it.

detention was quite limited.  They were not involved in the initial observation of Plaintiffs,

nor were they involved in the decision to detain them.  They simply responded to Stewart's

request for assistance.  In assisting Stewart, the security officers acted in good faith and

reasonable reliance on the information he provided.  *Cf.*, *United States v. Hensley*, 469 U.S.

221, 232 (1985) ("[E]ffective law enforcement cannot be conducted unless police officers

can act on directions and information transmitted by one officer to another and that officers,

who must often act swiftly, cannot be expected to cross-examine their fellow officers about

the foundation for the transmitted information.") (quoting *United States v. Robinson*, 536

F.2d 1298, 1299 (9th Cir. 1976)).  Each Plaintiff testified that the security officers did not

use racially discriminatory or prejudicial language during the incident.  Windmon Dep. at 79,

King Dep. at 42-43, Horne Dep. at 35-36.  Nothing in the record regarding Corporate

Security's involvement indicates racial animus on the part of the officers during their limited

role in the incident.

In response to Corporate Security's motion for summary judgment, Plaintiffs did not

attempt to point to any evidence in the record supporting their claim.  The section of their

response brief addressing § 1981 simply recites the allegations of their complaint, cites the

*Chapman* decision, and concludes that Corporate Security violated the equal benefit clause.

This does not even approach the burden that Plaintiffs must satisfy on summary judgment.

*See e.g.*, FED. R. CIV. P. 56(e); *Daniel*, 375 F.3d at 381 (noting that "a non-movant [on

summary judgment] may not rest upon mere allegations or denials of his pleading, but must

set forth specific facts showing that there is a genuine issue of material fact for trial.")
(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)).  Even if the Court
evaluated the evidence Plaintiffs offered in support of their state law tort claims against
Corporate Security, summary judgment would be appropriate because they have not pointed
to anything in the record indicating racial animus or intentional discrimination on the basis
of race.  Accordingly, Corporate Security's motion for summary judgment on Plaintiffs' equal
benefit claim is granted.

In light of the disposition of Corporate Security's motion for summary judgment on
Plaintiffs' equal benefit claim, the claim against Sequoia can also be quickly resolved.  As
mentioned previously, Plaintiffs have not disputed that there were no Sequoia employees
involved in the incident.  Rather, Plaintiffs' equal benefit claim against Sequoia is premised
upon a theory of vicarious liability for the actions of the employees of Sequoia's independent
contractor, Corporate Security.  While the parties dispute whether Sequoia can be held liable
under § 1981 based upon *respondeat superior*, it is not necessary to resolve this question
because Plaintiffs have failed to demonstrate that Corporate Security's actions violated
§ 1981.  Accordingly, this finding precludes Sequoia from being held vicariously liable for
Corporate Security's conduct.

As the record indicates, J.C. Penney's involvement in the detainment was much greater
than the other Defendants and requires a more detailed analysis.  Taken in the light most
favorable to Plaintiffs, the record reveals that: 1) Stewart watched Plaintiffs in the store after

being alerted that one member of the group was believed to have been shoplifting on a previous occasion; 2) Stewart requested that Plaintiffs be detained after he lost sight of them but observed two other girls, who had briefly joined Plaintiffs in the store, engaging in suspicious behavior; 3) while awaiting the arrival of the police, Stewart commented "we don't want the whole damned Benton Harbor in here"; 4) J.C. Penney management determined that Stewart did not follow the store's loss prevention policy during the incident; and 5) Plaintiffs are black and the J.C. Penney employees involved are white.  Plaintiffs assert that this evidence gives rise to a reasonable inference that Plaintiffs' stop and detention were racially motivated.  The Court does not agree.

While the detainment may have been in violation of J.C. Penney's store policy and may have been overzealously initiated on less than probable cause, this does not lead to an inference that Stewart's actions were racially motivated.  If anything, this evidence leads to an inference that Plaintiffs were falsely imprisoned.  Plaintiffs may or may not have a valid false imprisonment claim, but whether their claim of a violation of state tort law is valid does not translate into an inference of racially-motivated conduct.  Plaintiffs essentially invite the Court to leap from the arguably reasonable inference that they were falsely imprisoned to an inference that Stewart's actions were intentionally discriminatory on the basis of race.  They invite the Court to make this leap without any direct or circumstantial evidence from which to infer racial animus.  As the Sixth Circuit explained in *Chapman*, the equal benefit clause does not federalize state tort law because, in order to prevail, a litigant must prove

"intentional discrimination on the basis of race, which involves a high threshold of proof." 319 F.3d at 832-33.  Applying this principle to this case, it is clear that Plaintiffs cannot transform a state tort claim of false imprisonment into a federal § 1981 claim, absent proof of intentional racial discrimination.

The only evidence that arguably reveals a racial tone is Stewart's comment in the security office referencing Benton Harbor.  This comment was isolated and is at best ambiguous.  While it may have ambiguous racial implications, it could just as easily have been a reference to the city in which the incident was taking place and the overcrowded nature of the small security office.  Moreover, the fact that the participants in the incident were of different races adds little support to Plaintiffs' claim and is simply not enough to infer racial animus.  *See Campbell v. Morrison*, No. 94-1443, 1996 WL 511579, *8 (6th Cir. Sept. 9, 1996) (holding that the fact that plaintiff is black and defendants are white is insufficient to sustain a claim under § 1981's equal benefit clause); *Cunningham* 2003 WL 23471541, *17 (same); *McKenzie v. City of Mipitas*, 738 F. Supp. 1293, 1301-02 (N.D. Cal. 1990).  This however, appears, to be the central aspect of Plaintiffs' claim.  In their view, they were wrongly suspected of shoplifting and were detained in violation of a store policy by white store employees.  They are African-American, therefore, this act must have been racially motivated.  Plaintiffs overlook a critical aspect missing from this syllogism: evidence of intentional racial discrimination.  Stripped of its subjectivity, Plaintiffs have failed to allege either direct or circumstantial evidence that approaches the "high threshold of proof"

required under § 1981, *see Chapman*, 319 F.3d at 833, and certainly have not alleged evidence from which a jury could reasonably conclude that the actions of J.C. Penney's employees were racially motivated.   Accordingly, J.C. Penney's motion for summary judgment on Plaintiffs' equal benefit clause claim is granted.[12]

IV.

In light of the Court's disposition of this matter, dismissing Plaintiffs' federal claims, the Court will not address and expresses no opinion on the validity of any state law claim Plaintiffs may have.   Moreover, because the federal claims have been dismissed the Court declines to take supplemental jurisdiction over Plaintiffs' pendent state claims.   *See* 28 U.S.C. § 1367(c)(3) (2005); *Widgren v. Maple Grove Twp.*, 429 F.3d 575, 586 (6th Cir. 2005) ("When all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state claims . . . .") (quoting *Musson Theatrical, Inc. v. Fed.*

---

[12]In Plaintiffs' surreply they rely on *Pierre v. J.C. Penney, Inc.*, 340 F. Supp. 2d 308 (E.D.N.Y. 2004), to support their equal benefit claim.   Reliance upon *Pierre* is misplaced for a variety of reasons.   First, it is not binding on this Court.   Second, it addressed whether plaintiff could show a nexus between the private defendant's actions and a state law or proceeding as required by the Second Circuit's decision in *Phillip v. Univ. of Rochester*, 316 F.3d 291 (2d Cir. 2003).   *Pierre*, 340 F. Supp. 2d at 310-11.   This "nexus" requirement has not been adopted by the Sixth Circuit.   *See Chapman*, 319 F.3d at 829-30 (holding that equal benefit clause unambiguously applies to private action).   Third, *Pierre* does not address the relevant, dispositive issue on Plaintiffs' claim, evidence of intentional discrimination.   *Pierre* arose under FED. R. CIV. P. 12(b)(6), therefore plaintiff's allegations regarding racial discrimination were accepted as true.   *See e.g.*, *Stolicker v. Muller, Muller, Richmond, Harms, Myers, and Sgroi, P.C.*, 387 F. Supp. 2d 752, 753 (W.D. Mich. 2005) (Bell, C.J.). That is not the case here.   As set forth above, Plaintiffs' have failed to offer evidence supporting their claim of intentional racial discrimination.   *Pierre* does not address that issue and certainly does not remedy that failure.

34

*Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996)); *Peters*, 427 F.3d at 1038 (holding that district court did not abuse its discretion in declining supplemental jurisdiction over plaintiffs' state law claims in light of its dismissal of their federal claims).  Accordingly, Plaintiffs' complaint is dismissed in its entirety.  An order will be entered consistent with this opinion.

Date:  ____April 26, 2006____         /s/ Robert Holmes Bell_____
                                      ROBERT HOLMES BELL
                                      CHIEF UNITED STATES DISTRICT JUDGE